## PATERSON and others v. DAKIN and others.

*(District Court, S. D. Alabama. July 23, 1887.)*

1. ADMIRALTY—JURISDICTION—INJUNCTION.
   A court of admiralty has no power to grant an injunction enjoining the defendants from enforcing a claim against a cargo, nor to enforce specific performance, nor to compel the execution of a contract.

2. CHARTER-PARTY—PARTIES—REMEDIES.
   Where a charter-party which is made with the owners only, the master not being a party to it, stipulates that the master is to sign the bills of lading, an action *in personam* will not lie against the master for failing to sign a clear bill, but the remedy is against the owners, or *in rem* against the vessel.

3. MASTER—PERSONAL LIABILITY—VINDICTIVE DAMAGES—CONVERSION.
   Where a master, whose duty it is to sign his ship's bills of lading, indorses on a bill of lading a claim for demurrage which he honestly believes to be well founded, he is not liable for vindictive or exemplary damages on its being proven that there was no legal or just claim for demurrage, nor under these circumstances is he liable for conversion.

4. SAME—NOMINAL DAMAGES.
   Where there is no legal and just claim for demurrage or otherwise, it is the master's duty to give a clear bill of lading; and he is liable for nominal damages for indorsing an unfounded claim upon it, though honestly believing such claim to be valid.

5. CHARTER-PARTY—CONSTRUCTION.
   Where a charter-party provides that "from the computation of the time allowed for delivering timber to the ship shall be excluded any time lost by reason of drought;" and it appears that at the shipping point agreed upon between the parties it was customary to float the timber down certain streams and rivers to the point of shipment, which were liable to be dried up, but the harbor and booms were never endangered by drought, the word "drought" will be held to apply to the rivers and streams, and will not be held as surplusage.

Libel *in personam* to compel clear bill of lading.

*R. Inge Smith* and *R. H. Clarke*, for libelants.

*G. L. & H. T. Smith*, for respondents.

TOULMIN, J. This libel is filed against George Dakin, master of the ship Austria, and Wylie, Fisk & Co., brokers and agents of the owners of the ship. It is filed for three purposes, viz.: (1) To enjoin the defendants from enforcing a claim for demurrage *against the cargo*, the charter-

party providing that the master or owner is to have a lien on the cargo for all demurrage; (2) to require defendants to execute and deliver to libelants a proper clear bill of lading for the cargo; (3) to recover of the defendants such damages as libelants may have sustained by the failure and refusal of the master to sign a clear bill of lading.

On the hearing of the exceptions in this case I held that the court had no power to grant the injunction prayed for, and that the exceptions to so much of the libel as sought this relief were sustained. But, being inclined to the opinion that the admiralty court had the power to compel the execution and delivery of a proper bill of lading, and could award damages for a breach of the contract, which provides that the master is to sign bills of lading, I retained the case, and proceeded with it upon those questions. The libel in seeking to compel the master to sign and deliver clear bills of lading is in the nature of a bill in equity seeking specific performance of a contract. The master is the person to sign bills of lading, and he is bound to sign proper bills of lading. But, if he fails or refuses to do so, has this court the jurisdictional power to compel him to do it?

Judge STORY says:

"Courts of admiralty are not, by their constitution and jurisdiction, confined to the mere dry and positive rules of the common law; but they act upon the enlarged and liberal jurisprudence of courts of equity, so far as their powers extend. But courts of admiralty have no general jurisdiction to administer relief as courts of equity. If a maritime contract is broken, the admiralty, concurrent with courts of law, can only give damages for the breach of it; whereas the chancery court may compel the party, in some cases, to a specific performance. A court of admiralty has no more power to compel such specific performance than it has to set aside the contract for fraud, or correct a mistake, or decree the execution of a trust. These are matters properly subject to the cognizance of courts of equity and not of the admiralty." *Brown* v. *Lull*, 2 Sum. 443.

In *Andrews* v. *Essex F. & M. Ins. Co.*, 3 Mason, 16, the same judge broadly declares that courts of admiralty cannot entertain a libel for specific performance. "Courts of admiralty," he says, "have jurisdiction over maritime contracts when executed, but not over those leading to the execution of maritime contracts. If there was a contract to sign a shipping paper, or to execute a bottomry bond, and the party refused to perform it, the admiralty court cannot take jurisdiction and enforce its performance."

But it may be said that the contract, the specific performance of which was sought in this case, was not a maritime one, but only preliminary to the execution of a maritime contract. This is true, but still the broad proposition is asserted that courts of admiralty cannot entertain a libel for specific performance. The remedy invoked in such case is purely an equitable one. In *Kellum* v. *Emerson*, 2 Curt. 79, Judge CURTIS says: "It is often said that a court of admiralty is a court of equity, acting on maritime affairs." "A court of admiralty," says he, "applies the principles of equity to the subject within its jurisdiction. But that jurisdiction differs widely from the jurisdiction of courts of

chancery." In Davis v. Child, Daveis' Ware, 81, it is said: "It was never contended that a court of admiralty has the authority to decree a specific performance of an agreement."

I am bound, then, to conclude that, although a court of admiralty is in many respects a court of equity acting in maritime affairs, it has no chancery powers. Its jurisdiction differs from that of a court of equity. The power to decree a specific performance of a contract is purely equitable, and belongs exclusively to chancery. That a court of admiralty does not entertain a libel for a specific performance of a contract, nor to compel the execution of one, see Henry, Adm. Jur. 65, § 25, and note; 1 Add. Cont. § 497; The Ives, 1 Newb. Adm. 205.

Can this libel be maintained on the question of damages? This is a suit against the master, and Wylie, Fisk & Co., the ship agents, in personam; and from them damages are claimed for a breach of contract. The charter-party is the contract, and it stipulates that the master is to sign bills of lading,—and this of course means proper bills of lading. If there was no just claim for demurrage, a proper bill of lading in this case would have been a clear bill of lading. It is contended by libelants that there was no legal and just claim for demurrage, and that the master's refusal to give them a clear bill of lading was a breach of the contract, by which they were damaged. From my construction of the charter-party, and in my view of the evidence in this case, my opinion is there was no legal and just claim for demurrage; that the master should have given a clear bill of lading, and that from his refusal to do so there has been a breach of the contract. I will have more to say on this subject hereafter. But the question recurs, can the court award damages in this case for a breach of the contract? A charter-party is a maritime contract, and, as between the parties to it, a court of admiralty has jurisdiction to determine the obligations arising therefrom, and whether they have been violated; and that, in an action in personam or in rem. Post v. Jones, 19 How. 150; The Fifeshire, 11 Fed. Rep. 743; Maury v. Culliford, 10 Fed. Rep. 388; The A. M. Bliss, 2 Low. Dec. 103; Oakes v. Richardson, Id. 173. The parties to this contract, which is the charter-party, are the owners of the vessel, and the libelants. The master is not a party to it, and Wylie, Fisk & Co. are connected with it only as agents of said owners. The refusal of the master to issue a proper bill of lading is a breach of the contract, which can be enforced in rem against the vessel, or in personam against the owners, for any damage the libelants may have sustained thereby. But my opinion is that the libelants cannot recover of these defendants any damages for a breach of the contract, even if libelants had shown any to have been sustained.

But it is further contended that, independently of the charter-party, there was imposed by law on the master a duty to sign proper bills of lading, and that he failed and refused to perform this duty, while, vexatiously to set up an unfounded claim to demurrage, and to impair the negotiability of the bill of lading which he did give, and to destroy or impair the salability of the cargo, he indorsed a protest and claim for demurrage on said bill, to the loss and damage of libelants.

There is no question that a duty was imposed by law on the master to sign a proper bill of lading. See Macl. Shipp. 368, and authorities cited in note; *The Ferreri,* 9 Fed. Rep. 468. And if he refused to do so vexatiously, and set up an unfounded claim to demurrage, to inconvenience and damage libelants, then I think libelants would be entitled to vindictive damages, whether any actual damage was proven or not. But the proof wholly fails to sustain such a complaint. There is no evidence to induce me to believe that the master acted vexatiously, and with a purpose to inconvenience and damage libelants. I have no doubt of the honesty of his claim, and think his good faith was shown by his desire and effort to adjust the matter amicably, and without a resort to litigation. I therefore find no just claim for vindictive or exemplary damages; and, as no actual damages have been proven, none can be awarded libelants in any aspect of the case.

It is further contended that the master was bound to sign a proper bill of lading, and, failing or refusing to do so, is guilty of a conversion of the cargo, and is liable for its value. The master is bound to sign a proper bill of lading, as I have before said, if he has received the cargo on board, or to put it ashore again at the ship's expense; otherwise he and the owners might be liable for a conversion. See Macl. Shipp. *supra,* 368 and note; *The Ferreri,* 9 Fed. Rep. 468. But the facts alleged in this libel do not make out a case of conversion. It is true that in admiralty an action can never fail for want of proper allegations, if merits clearly appear in the record: that is to say, amendments of either form or substance to conform to the evidence will be allowed at any time before a decree. *Richmond* v. *New Bedford Copper Co.,* 2 Low. Dec. 315. But the facts proven in this case are not sufficient to warrant a decree for conversion. nor would such a decree come within the scope of the prayer of the libel.

Having held that the libelants have not shown right to recover actual damages, I will now consider whether they are entitled to a decree for nominal damages. For the violation of any legal right, nominal damages, at least, will be allowed. This principle applies to all actions, whether for tort or breach of contract, and whether the right is personal or relates to property. The failure to perform a duty is a legal wrong, independent of actual damage to the party for whose benefit the performance of such duty is due. The omission to show actual damages, and the inference therefrom that none had been sustained, do not necessarily render the case trivial. 1 Suth. Dam. 11, 13, 14. An action is maintainable for a breach of an implied duty arising out of and incident to a contract. 1 Add. Torts, p. 26, §§ 27, 28. If there was no demurrage justly due, a proper bill of lading would have been a clear bill of lading, and it would have been the master's duty to give such a one; and his refusal to do so would have been a violation of libelants' legal right, for which they would have been entitled to at least nominal damages. If, on the other hand, there was demurrage due, a proper bill of lading would have been one indorsed with a protest and claim for demurrage.

This brings me to the question, was there any demurrage due? The

charter-party provides that from the computation of the time allowed for delivering the cargo to the ship shall be excluded any time lost by reason of drought. It is claimed by libelants that the whole 25 days allowed for the delivery of the cargo were lost by reason of drought, and that this directly prevented the delivery of the cargo within the time specified; that they were released from the stipulation in the contract as to the 25 days by this express exception, and hence not liable for any demurrage. This vessel was to be loaded at Ship island. It appears that it was usual for vessels loading with timber at that port to get their cargoes from Moss Point. It appears that it was in the contemplation of the parties to this charter-party, at the time it was made, that this vessel was to get her cargo from Moss Point. It appears that the usual and ordinary way of supplying the Moss Point market with timber, both hewn and for mill purposes, was down the rivers and streams which flow from the interior of the country to that point. And it appears that from a short time before the charter-party was made, down to about the time the loading of the vessel was completed, there prevailed in all the country from which Moss Point was supplied with timber an extraordinary drought, such as had not occurred before in many years, and which affected said rivers and streams to such an extent as to prevent the floating and transporting of timber down them to Moss Point, or at least necessitated its transportation in such small quantities and with such delay as greatly to affect and retard business at that point. It appears that libelants had their timber, which was intended for the cargo of the ship Austria, in these streams and rivers, and that by reason of the drought they were able to get but a small part down, and that with much delay, expense, and trouble. The ship was finally loaded with a cargo which came principally from the port of Mobile, and which, it appears, was obtained by libelants by extraordinary effort and expense. The drought also affected the Mobile timber market, and the supply of timber there. It also appears that while a drought seriously affects the interior creeks and rivers and impairs and retards the transportation of timber down them, it in nowise affects the waters at Moss Point and Mobile, the booms at those points where timber is kept, or the transportation of timber from the booms to the ship at anchor.

It is contended on the part of the defense that the exception in the charter-party as to drought has no meaning, is a mere matter of form, and that libelants can claim no rights under it. The rule of law is that a contract must be construed or taken in a sense that will give to it some operation, rather than that which will give it none, and effect must be given to all the words and provisions, if possible. 1 Brick. Dig. 386; 1 Pars. Shipp. & Adm. 319; 1 Add. Cont. § 220. And every contract is to be interpreted in connection with the surrounding circumstances. Stipulations in a charter-party as to loading a vessel must be construed with reference to the customs of the port of loading. Customs of the particular trade are tacitly incorporated in the contract. If the usages of a particular port are well known, at least in the trade to which the charter-party relates, it will be held, in the absence of exclusive words in it,

to have been framed on the basis of such usages, although to one of the contracting parties these usages were unknown. The construction of a charter-party should be liberal, agreeable to the real intention of the parties, and conformable to the usage of trade in general, or of the particular trade to which the contract relates. 1 Add. Cont. § 221; 1 Pritch. Adm. Dig. 473–487; Macl. Shipp. 361; 1 Pars. Shipp. & Adm. 319, and note.

Construing the charter-party in question by the light of these principles, I am bound to hold that the stipulation in reference to drought, in order to give it any effect or operation at all, must apply to the rivers and creeks from which the supply of timber for Moss Point came, in view of the usages of the particular port and trade to which the contract relates; and being satisfied from the evidence that the drought prevented or delayed the delivery of the cargo to the ship, I am of opinion that the libelants and cargo are released from any liability for demurrage by the exceptions in the charter-party, and that none is due.

But it is contended on the part of the defense that libelants were bound to load the vessel at all hazards, or pay for the delay; that they should and could have obtained a cargo elsewhere. If they were released from the contract by bringing themselves under the exceptions in it, my opinion is that they were under no *legal* obligation to go elsewhere and obtain a cargo. But when they found they would not be able to load the ship with the cargo, as contemplated by the contract, they were under a moral obligation to do all they reasonably could to save the ship and owners from loss. This I think the proof shows they did. If the libelants had accepted the bill of lading given them as a proper one, with no intention at the time of litigating about it, they could not maintain this suit. But the evidence satisfies me they did not so accept it. The testimony of Dow and Capt. Dakin is clear as to this. Hence my opinion is that libelants were entitled to a clear bill of lading, and that it was the master's duty to sign a clear bill.

My judgment therefore is that libelants are entitled to a decree as against defendant Dakin for nominal damages, no actual damages having been shown; and I think the prayer for general relief in the libel is sufficient to warrant such a decree. But I consider there is no legal claim against Wylie, Fisk & Co., and as to them the libel is dismissed. A decree will be entered in accordance with this opinion.