**MARINE COOKS & STEWARDS, AFL,** a voluntary association, James O. Willoughby, Virgil Rogers and Willard Richards, Appellants,

v.

**PANAMA STEAMSHIP COMPANY, Ltd.,** a corporation, et al., Appellees.

No. 15637.

United States Court of Appeals Ninth Circuit.

April 6, 1959.

J. Duane Vance, Seattle, Wash., for appellants.

Summers, Bucey & Howard, Charles B. Howard, Seattle, Wash., John D. Mosser, Portland, Ore., for appellee.

Before POPE, HEALY and ORR, Circuit Judges.

ORR, Circuit Judge.

Upon the complaint of appellees the trial court issued an order enjoining appellants from conducting certain alleged picketing activities. On the appeal lodged in this court we have had two hearings.

At the first hearing appellants rested their contentions on lack of jurisdiction of the trial court to issue the temporary injunction because of the prohibition contained in the Norris-LaGuardia Act, 47 Stat. 70 (1932), 29 U.S.C.A. § 101 et seq. (1956).

On the second hearing their contention was broadened to include an assertion of a lack of statutory basis for the district court to consider this action at all on the civil side either as to the injunction or the claim for damages, which latter claim is still pending below.

The essential facts follow.

The S. S. Nikolos, a vessel registered under the Liberian flag and owned by appellee Panama Steamship Company Ltd., a foreign corporation, arrived in Tacoma Harbor in the State of Washington during the early morning hours of June 10, 1957. Its master, officers and crew were aliens. The time-charterer, appellee Seatankers, Inc., is not a citizen of the United States.

The ship was carrying a cargo of bulk salt loaded at a port on the West Coast of Mexico. The consignee was the Hooker Electro-Chemical Co. to whom the cargo was to be delivered at a berth in Tacoma Harbor. The ship was cleared and passed by the Immigration, Quarantine and Custom authorities and was therefore lawfully entitled to discharge its cargo.

While at anchorage awaiting the assignment of a berth, the ship was approached by a small vessel, the "Will-O-Bee", displaying a "Picket Boat" sign and then and there operated by appellants Willoughby, Rogers, and Richards, members of appellant Marine Cooks & Stewards AFL, Willoughby being the duly authorized Port Agent. Willoughby boarded the Nikolos and notified the master that the ship was being picketed by his association.

The "Will-O-Bee" continued to circle around the Nikolos displaying its picket signs. In addition, Willoughby threatened the Hooker Electro-Chemical Co. with the establishment of a picket line at its dock if the Nikolos was allowed to berth.

In awarding a temporary injunction pending a final determination as to damages and the issuance of a permanent injunction, the trial court made findings to the effect that the picketing conduct of appellants was an unlawful interference with international commerce and particularly with the right of appellees to carry out an international voyage and maritime contract of affreightment, utilizing a vessel lawfully registered with a friendly foreign nation and manned by an alien crew under foreign shipping articles. Further findings are that appellees have also entered into and are seeking other like contracts; that by reason of the picketing the Nikolos has acquired the reputation of a "hot ship" and that appellees' reputation for carrying out their contractual obligations have become impaired.

The trial court further found that the United States as a nation has international obligations with respect to commerce and with respect to the relations of this country with friendly maritime nations and that the acts of the appellants might impair such obligations and cause irreparable damage to such relations. It found that the appellees had no adequate remedy at law and that the public officers charged with a duty to protect appellee's

property were unable to furnish adequate protection as shown by lack of evidence of any action by such authorities and the fact that no public official was charged with such responsibility.

The trial court also found that there had been no fraud; no physical violence to persons or injury to tangible property or threats of such by appellants.

It seems to be an accepted fact that there was no dispute between the members of the crew or any of them and the master or owners. The picketing was purely a matter of protest by the appellants of the alleged threat to American working standards created by the foreign crews who work under substantially less favorable circumstances than crews on American ships.

In now turning to a consideration of the questioned jurisdiction of the trial court to entertain the action, we keep in mind that the jurisdiction of a federal district court rests upon statutory grant, Sheldon v. Sill, 1850, 8 How. 441, 49 U.S. 441, 12 L.Ed. 1147, and he who invokes that jurisdiction has the burden of establishing it. McNutt v. General Motors Acceptance Corp., 1936, 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135.

Appellees upon whom rests that burden specifically disclaim diversity of citizenship as creating the statutory basis. See 28 U.S.C.A. § 1332.[1]

Appellee has also refrained from invoking jurisdiction on the admiralty side under 28 U.S.C.A. § 1333. This position may have been dictated by the unavailability of a jury trial on the damage issue in admiralty and because of appellee's belief that admiralty cannot afford injunctive relief.[2]

Appellee rests his claim of jurisdiction on 28 U.S.C.A. § 1331 creating general federal question jurisdiction in the district court. Section 1331 provides that "the district courts shall have original jurisdiction of all civil actions wherein the matter in controversy * * * arises under the Constitution, laws, or treaties of the United States." (It is clear and conceded that the amount in controversy required by the statute in force at the time of the institution of suit was met.)

■■ In sustaining jurisdiction under § 1331 the first hurdle is the requirement that the substantive law creating the cause of action be federal or that some element of federal law must be established as part of the cause of action. Smith v. Kansas City Title & Trust Co., 1921, 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577. That hurdle is cleared here because appellee's cause of action is based on interference with maritime traffic on navigable waters and on interference with the performance of a maritime contract constituting maritime torts.[3] The sub-

1. Apparently appellee rejects the diversity theory because some of the appellants are associations whose citizenships are determined by that of their members [see e. g. Chapman v. Barney, 1889, 129 U.S. 677, 9 S.Ct. 426, 32 L.Ed. 800 (joint stock co.); Levering & Garrigues Co. v. Morrin, 2 Cir., 1932, 61 F.2d 115 (labor union)] and some of the members are aliens as are all of appellees. Under prior forms of § 1332 it has been held there is no jurisdiction under such circumstances. Ex Parte Edelstein, 2 Cir., 1929, 30 F.2d 636.

In view of the result we reach, it is unnecessary to consider the difficult statutory and constitutional questions that would have been involved had appellee urged this as a ground for jurisdiction.

2. It has been held that the admiralty court does not possess the distinctive remedial

powers of equity. See The Eclipse, 1890, 135 U.S. 599, 10 S.Ct. 873, 34 L.Ed. 269; Gilmore & Black, The Law of Admiralty 37–39 (1957). In particular it has been held that admiralty has no power to issue an injunction. Sound Marine & Machine Corporation v. Westchester County, 2 Cir., 1938, 100 F.2d 360, certiorari denied 1939, 306 U.S. 642, 59 S. Ct. 582, 83 L.Ed. 1042.

3. See e. g. The Plymouth, 1886, 3 Wall. 20, 70 U.S. 20, 36 wherein the Supreme Court stated that "every species of tort, however occurring * * * if upon the high seas or navigable waters, is of admiralty cognizance"; See also Sidney Blumenthal & Co. v. United States, 2 Cir., 1927, 30 F.2d 247, certiorari denied Admiral-Oriental Line v. United States, 279 U.S. 847, 49 S.Ct. 345, 73 L.Ed. 991.

stantive law of such torts is basically federal. See Pope & Talbot v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Gilmore & Black, op. cit. supra note 2 and 2, 45 and cases cited therein. See also Romero v. International Terminal Operating Co., 79 S.Ct. 468, 483 ("the federal nature of the maritime law administered in the federal courts has long been an accepted part of admiralty jurisprudence").

Having determined that the cause of action in the instant case depends upon federal law, the next problem is whether it arises under the "Constitution, laws, or treaties of the United States" within the meaning of § 1331.

Most forceably argued pro and con has been the line of controversy typified by Doucette v. Vincent, 1952, 194 F.2d 834 in the first circuit, Paduano v. Yamashita, 1955, Kisen Kabushiki Kaisha, 221 F.2d 615 in the 2nd circuit; Jordine v. Walling, 1950, 185 F.2d 662 in the 3rd Circuit and Jenkins v. Roderick, 1957, 156 F.Supp. 299 in the Massachusetts District Court. All of those cases involved the question of whether certain seamen or longshoremen suing for personal injuries could get a jury trial by proceeding on the law side of the federal court under § 1331. The theory in favor of such jurisdiction was that although the claims were cognizable in admiralty under 28 U.S.C.A. § 1333 [4] the savings clause of that section, in bold face type in note 4, allowed them to proceed in any court competent to give an *in personam* remedy of damages and § 1331 created such competence in the law side of the federal district court.

The existing difference of opinion has been resolved by the U. S. Supreme Court in the recent Romero case, supra [79 S.Ct. 475], wherein it was held that "saving clause" actions are not within the grant of § 1331. In that opinion it is stated that "from 1875 to 1950 there is not to be found a hint or suggestion to cast doubt on the conviction that the language of that statute (§ 1331) was taken straight from Art. III, § 2, cl. 1 (of the Constitution), extending the judicial power of the United States 'to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority.' Indeed what little legislative history there is * * * indicates that this was the source. Thus the Act of 1875 (creating the predecessor of § 1331) drew on the scope of this provision of clause 1, just as the Judiciary Act of 1789 (creating the admiralty jurisdiction) reflected the constitutional authorization of clause 1 of section 2 (sic), which extended the judicial power to all Cases of admiralty and maritime Jurisdiction." " * * * The grant of jurisdiction over 'suits of a civil nature at common law or in equity * * *' as derived from Article III, could not reasonably be thought of as comprehending an entirely separate and distinct class of cases—'Cases of admiralty and maritime Jurisdiction'."

The Supreme Court thus held that Congress in utilizing the language of the Constitution in its statutory grants of jurisdiction intended to separate *admiralty and maritime* on the one hand from *law and equity* on the other. Therefore appellee's argument that jurisdiction can be found under § 1331 because it is a savings clause action would be of no avail. But we are convinced that this is not a saving clause action. This is an action for an injunction, and admiralty at no time has had jurisdiction of such actions. We emphasize, this is not an action "saved" from the exclusive jurisdiction of admiralty; it is one never cognizable in admiralty. In terms of the Supreme Court distinction made in Romero, it is not a "case of admiralty and maritime jurisdiction" but a suit "of a civil nature * * * in equity" arising because of a breach of a federal duty.

4. "The district courts shall have original jurisdiction, exclusive of the courts of the States of * * * any civil case of admiralty or maritime jurisdiction, sav-

ing to suitors in all cases all other remedies to which they are otherwise entitled." (Emphasis added.)

It can not be said of this action as it is of "having clause" actions, that Congress did not intend to give a double jurisdiction as there is no jurisdiction under § 1333.

In order to understand the absence of a sufficiently broad equitable jurisdiction in admiralty to grant an injunction it is helpful to briefly trace the history of that court and body of law. Its early development is not entirely clear, but it apparently developed much as the law merchant during the renaissance period of world commerce.[5] Continental scholars then busy adapting the Roman (Civil) Law were attracted by this developing customary law and admiralty still bears their imprint.

The English port towns as well as the continental ones had "maritime courts" that adjudicated according to the customary sea law. The English development was affected by the creation of the office of the Lord High Admiral who originally was a naval officer concerned mostly with suppression of piracy. It is not clear just how and when he achieved jurisdiction over civil maritime matters, but by around 1400 that jurisdiction was so broad that Parliament moved to limit it by statute to "a thing done upon the sea". 13 Rich. II, c. 5 (1389) and 15 Rich. II, c. 3 (1391). It still maintained a substantial jurisdiction as a court of record, however, until eventually it became involved in the great struggles for power among the various English courts. It then suffered severe narrowing of its jurisdiction because of the jealousy of the common law courts which issued writs of prohibition preventing it from entertaining actions of various kinds.[6] For example, contract actions to be cognizable in admiralty not only had to concern the sea, but had to have been made at sea.

Apparently English lawyers at the time of the adoption of the American Constitution acted on the broad rule that "nothing was to be left to the Admiralty of which the common law could conveniently take cognizance * * *"[7]—a sort of reverse savings clause. Anything for which a writ could be gotten from a common law court would not be allowed in admiralty; only what was not available elsewhere could admiralty take.[8]

Early in American judicial history the problem of the breadth of admiralty jurisdiction arose. As reference points there was the English jurisdiction already described; the English Colonial Admiralty courts which had much broader jurisdiction since it was convenient for Britain to have a non-jury court of broad power in the colonies; and the broad jurisdiction of the continental admiralty courts which was similar in extent to the English prior to curtailment.

Earlier American cases frequently assumed a narrow jurisdiction, but in Waring v. Clarke, 1847, 5 How. 441, 46 U.S. 441, 12 L.Ed. 226 the broad continental concept was accepted. As later stated in Insurance Company v. Dunham, 1870, 11 Wall. 1, 78 U.S. 1, 24, 20 L.Ed. 90, "the admiralty and maritime jurisdiction of the United States is not limited either by the restraining statutes or the judicial prohibitions of England, but is to be interpreted by a more enlarged view of its essential nature and objects, and with

5. The history here set out is mostly derived from Gilmore & Black, The Law of Admiralty (1957) and from Morrison, The Remedial Powers of Admiralty, 43 Yale Law Rev. 1 (1933).

6. The common law judges were also fearful of the power of admiralty that sat without a jury. It is noteworthy that at an earlier time admiralty apparently did have jury trials at least in some actions. See Mathiasen, Some Problems of Admiralty Jurisdiction in the 17th Century, 2 Amer.J. of Legal History 215 (1958).

7. Roscoe, Admiralty Practice (5th ed. 1931) at 8-9.

8. The English admiralty jurisdiction was vastly enlarged in the nineteenth century, 3 & 4 Vict., c. 65 (1840), 13 & 14 Vict. c. 26 (1850), 24 Vict. c. 10 (1865). It is now a part of the High Court of Justice in a single division with probate and divorce.

reference to analogous jurisdictions in other countries constituting the maritime commercial world  *  *  *."

But when it came to equitable jurisdiction there was no such parallel enlightenment. The relations between the admiralty and the Chancellor in England had escaped the attention which had been paid to the famed struggle between the former and the courts of common law. Apparently in the beginning there was a concurrent jurisdiction of sorts with a right asserted by the English Chancellor to take causes out of admiralty, the Chancellor being in a stronger position than even the common law courts with his injunctive powers. In *in rem* proceedings the Chancellor would not ordinarily invoke its concurrent jurisdiction unless the title came into dispute, but in "all proceedings *in personam* and in instances where any characteristically equitable relief was called for, the Chancellor always exercised the same full jurisdiction in maritime cases that he did in non-maritime cases. And the question of concurrent jurisdiction was eliminated by the *exclusion of the court of admiralty from the field.* The result was that such forms of relief as an accounting, specific performance, injunction, reformation or cancellation of contracts and relief against fraud generally, were available exclusively in Chancery." Morrison, supra at 11.

Notwithstanding the departure made by American courts from the narrow English restrictions imposed by the common law writs of prohibition, when determination of equitable rights and remedies were under consideration the English practice was followed. Thus it was held that equitable interests in a vessel must be left to ordinary land courts of equitable jurisdiction. See e. g. The Eclipse, 1890, 135 U.S. 599, 10 S.Ct. 873, 34 L.Ed. 269. Affirmative equitable relief has been consistently denied in admiralty under the prevailing view that admiralty does not possess the distinctive equity powers. See e. g. Davis v. Child, D.C.Me.1840, Fed.Case No. 3,628; The Eclipse, supra; The Robert R. Kirkland, D.C.N.J.1899, 92 F. 407. It has been specifically held that admiralty can not give injunctive relief. Schoenamsgruber v. Hamburg American Line, 1935, 294 U.S. 454, 55 S.Ct. 475, 79 L.Ed. 989; Sound Marine & Machine Corporation v. Westchester County, 2 Cir., 1938, 100 F.2d 360, certiorari denied 1939, 306 U.S. 642, 59 S.Ct. 582, 83 L.Ed. 1042; Paterson v. Dakin, D.C.S.D.Ala.1887, 31 F. 682.[9]

■ Thus this action or bill for an injunction to restrain a breach of a federal duty is an action that has arisen under the "law and equity" jurisdiction of § 1331;[10] the remedy sought has at no

9. There is a line of cases upholding the power of admiralty to assert equitable principles in actions otherwise within its province. "A court of admiralty is, as to all matters falling within its jurisdiction, a court of equity,  *  *  * it administers justice upon the large and liberal principles of courts which exercise a general equity jurisdiction." The David Pratt, D.C.Me.1839, Fed.Cas. 22, at page 24, No. 3,597. But when the question of *remedies* is reached the courts have resorted to the distinction between law and equity and have held that admiralty lacks the power to give equitable remedies. One commentator sees: "ground for hope that a doctrinal trend is in the making that would render the ordinary equitable remedies . . . available to the admiralty court . . ." Gilmore & Black, op. cit. supra note 2 at

39, based on the case of Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A., 1950, 339 U.S. 684, 70 S. Ct. 861, 865, 94 L.Ed. 1206 which held that admiralty could employ equitable powers when dealing with a case otherwise maritime in character. But that case cited The Eclipse, supra, as still being good law, stating: "Unquestionably a court of admiralty will not enforce an independent equitable claim merely because it pertains to maritime property."

It should be noted that admiralty by statute has been given injunctive power in certain limited areas not here applicable.

10. It was not until 1875 that Congress passed the predecessor of § 1331 first creating, except for a brief interval (Act of Feb. 13, 1801, § 11, 2 Stat. 89, 92

time been within the "admiralty and maritime" jurisdiction of § 1333.

■■ Having jurisdiction of the action for the injunction, the district court as a court of equity may within its discretion exercise the traditional power of equity to "clean-up" the controversy by awarding damages incident to its equitable jurisdiction. Of course there would be no right to a jury trial.

■ The remaining question raised by appellant is that the trial court was without jurisdiction to issue the temporary injunction because of the prohibition contained in the Norris-LaGuardia Act, 47 Stat. 70 (1932), 29 U.S.C.A. § 101 et seq. (1956). It is our conclusion that the Norris-LaGuardia Act does not apply. This view is based upon the holding of the Supreme Court in Benz v. Compania Naviera Hildalgo, S.A., 1957, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709.

The question before the Supreme Court in Benz was whether the Labor Management Relations Act of 1947, 61 Stat. 136, 29 U.S.C.A. § 141, so preempted the field of labor relations so as to deprive a state court of jurisdiction in a damage suit for wrongful picketing by an American union of a foreign vessel. The court held that there was no preemption because the Labor Management Act does not apply to labor disputes arising solely out of conditions on a foreign vessel even though an American Union was the party defendant. There, as here, the argument was made by the union that the standard of work and pay on the foreign vessel was a threat to the welfare of the American union members, yet the Supreme Court held the Act inapplicable. We find no such greater interest residing with the American union concerned in the instant case which would justify a differentiation of one from the other on that ground.

No legislative history has been brought forth to indicate that the Norris-LaGuardia Act should apply here, and as the Supreme Court said of the Taft-Hartley Act

repealed by Act of Mar. 8, 1902, 2 Stat. 132), the general federal question jurisdiction as we know it now. The legislative history of its passage leaves much to be desired in revealing any "intent" of the Congress. "In its original form the Act applied only to controversies involving diversity of citizenship and not to substantive federal rights." Frankfurter & Landis, The Business of the Supreme Court 66 (1927). The first section was designed to change certain features of the removal jurisdiction in diversity cases originally begun in a state court, and it created much controversy and dissent. Eventually the first section was struck out and the bill left the House containing only amendments to the procedure governing removal proceedings. In the Senate a substitute bill containing the eventual form of the Act was introduced and it passed the Senate the day of its introduction with only details arousing any discussion, and it was passed in the House in its same form. It is questionable whether the Congress had any consciousness of the enormity of the change in the judicial structure thus brought about. "Although this legislation in a very real sense revolutionized the concept of the federal judiciary, it passed almost unnoticed inside or outside the halls of Congress." Hart & Wechsler, The Federal Courts & The Federal System 729 (1953). See also Frankfurter & Landis, supra at 64–68.

"These courts (federal) ceased to be restricted tribunals of fair dealing between citizens of different states and became the primary and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States." Frankfurter & Landis, supra at 65.

Considering the times of the enactment and the language of the statute it would seem that the purpose of such an Act would be to provide a federal forum that would be sympathetic to and would become expert in the development of substantive federal law. *To find that Congress had carved out an exception from so broad a statute would require some certain evidence. The Supreme Court found such evidence in Romero in the use of the Constitutional language by Congress in drawing the statutes creating separate jurisdictions for "law and equity" and for "maritime and admiralty". This case as we have indicated falls outside the latter and within the former. Thus we find no evidence that this action based on substantive federal law was meant to be excluded from the grant contained in § 1331.*

in Benz, and we think equally applicable to the Act now under consideration, "the whole background of the Act is concerned with industrial strife between American employers and employees." 353 U.S. at page 143, 77 S.Ct. at page 702.

Appellant urges that the Taft-Hartley Act is a regulatory and substantive act whereas the Norris-LaGuardia Act is solely jurisdictional and thus it would be reasonable to deny the application of the former and still apply the latter. The answer is found in Benz where not only the application of the regulatory aspects of the Taft-Hartley Act, but also the whole complaint procedure and jurisdiction which could have provided protection for the foreign vessel against an unfair labor practice was denied.

If the Norris-LaGuardia Act was applicable here, the combination of such a holding and the holding in Benz that the Taft-Hartley Act administrative remedies are not available would result in there being no federal agency or court in which foreign commerce could seek protection. Such a result in the field of international commerce and relations should not be arrived at without more explicit direction from Congress.

Affirmed.

POPE, Circuit Judge (concurring).

The main problem here, as I see it, is whether what was said in Romero v. International Terminal, U.S., 79 S.Ct. 468, requires a holding that Section 1331 of Title 28 does not confer jurisdiction on the court below.

I think Romero, in holding that Section 1331 does not give jurisdiction to a Federal District Court, sitting at law, over a seaman's claims against his employer for a maritime tort, did not arrive at that conclusion because the authors of the Act of 1875 which set up the provisions here relevant could not then envision that some day it would be held, as in Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 206, 98 L.Ed. 143, that the right there upheld was a "federal right of recovery." It seems self evident that when the Act of 1875 spoke of suits arising "under the Constitution or laws of the United States", it was not speaking only of suits conceived of by the Act's authors in 1875 as federal rights of recovery. The Act of course looked to the future.

The basis for Romero was quite different. As I read it, it proceeds upon the thesis that the 1875 Act did not contemplate inclusion therein of the "long established, smoothly functioning" maritime jurisdiction of the federal courts which had "been left unchanged since the Act of 1789."

But what we have here is something quite different. Here the relief sought was injunction against a maritime tort. Relief of that character is wholly unknown to an admiralty court. This is not a case in respect to which "federal admiralty courts had been completely adequate to the task of protecting maritime rights rooted in federal law." Therefore, the reason which induced the court to hold that the action in Romero was of a sort excepted from the grant of an "arising under" jurisdiction is absent here. If, as seems to be conceded, Romero establishes that jurisdiction under Section 1331 is subject to an implied exception as to cases falling within the admiralty or maritime jurisdiction, it follows that such exception should not apply here for this is not such a case, but rather a case unknown to admiralty.